UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FOOD & WATER WATCH, INC. & KENNETH W. ABBOTT; | § § § § § § § | |
| Plaintiffs, | | |
| vs. | | Civil Action No. _____ |
| KENNETH SALAZAR, U.S. SECRETARY OF THE INTERIOR, AND MICHAEL SAUCIER, REGIONAL DIRECTOR OF MINERALS MANAGEMENT SERVICE FOR THE GULF OF MEXICO; | § § § § § § § § § § | Jury Trial Requested |
| Defendants. | | |

## ORIGINAL COMPLAINT FOR INJUNCTIVE RELIEF

### I.
### INTRODUCTION

1.0     Plaintiffs, Food & Water Watch, Inc., and Kenneth W. Abbott bring this action under the Submerged Land Act, 43 U.S.C. § 1301, *et seq.*, to compel Kenneth Salazar, U.S. Secretary of the Interior, and Michael Saucier, Regional Director of the Minerals Management Service for the Gulf of Mexico, to temporarily prohibit any operations or activities, including production, at the BP Atlantis Facility. *See* 43 U.S.C. § 1349(a)(1).

### II.
### JURISDICTION AND VENUE

2.0     The Court has federal question jurisdiction and venue over this action pursuant to 28 U.S.C. § 1331 and the Submerged Land Act, 43 U.S.C. § 1349(b)(1).

### III.
### PARTIES

3.0     Plaintiff, Food & Water Watch, Inc. ("FWW") is a national, non-profit, public interest consumer advocacy organization, headquartered in Washington, D.C.

FWW advocates for environmental protection and supports the long-term well-being of coastal and fishing communities. A number of FWW members derive significant income from commercial fishing, oyster harvesting, and shrimping in the Gulf of Mexico and elsewhere. FWW also promotes safe and sustainable seafood for consumers, while helping to protect the environment and supporting the long-term well-being of coastal and fishing communities. Further, FWW's members utilize the Gulf of Mexico for professional, aesthetic, recreational interests. FWW's members rely on the Gulf of Mexico to procure, use or otherwise enjoy marine life, wild species and natural resources located within the Gulf of Mexico. Their ability to ensure the health of the fish they consume and their ability to continue to visit, observe, and enjoy the wild species and natural resources of the Gulf, depend upon the survival, health, and well-being of the natural resources, wild fish and other species in the Gulf of Mexico and its ecosystems.

3.1     Plaintiff, Kenneth W. Abbott, worked in the administrative offices of the BP Atlantis Project located at Energy Tower 1, 11700 Katy Freeway, Harris County, Texas. Mr. Abbott worked as project control supervisor and was responsible for document databases and maintaining critical project documentation. Mr. Abbott is the "whistleblower" who divulged BP's failure to maintain records of: modifications to requisite subsea engineering documents, construction of subsea equipment according to approved engineering design, mandatory hazards analyses, and mandatory testing completed on equipment. Because of Mr. Abbott's efforts to bring BP into compliance with DOI and MMS regulations, Mr. Abbott was terminated from his position. Further, Mr. Abbott, as a resident of the Gulf of Mexico Coast and as a recreation user of the Gulf of Mexico, seeks to ensure the compliance with MMS regulations.

3.2     Defendant, Kenneth Salazar, Secretary of the United States Department of

2

the Interior ("DOI"), is charged with the enforcement of statutes, regulations, practices, and policies complained of in this action, and is sued herein only his official capacity.

    3.3    Defendant, Michael Saucier, Gulf of Mexico Regional Director of Mineral Management Service ("MMS") is charged with management of production and development of offshore natural resources on the Outer Continental Shelf (OCS) for the Gulf of Mexico, which includes enforcement of statutes, regulations, practices, and policies complained of in this action, and is sued herein only his official capacity.

## IV.
## CONDITIONS PRECEDENT

    4.0    In accordance with 43 U.S.C. § 1349, Plaintiffs have provided DOI and MMS with ongoing notice of the alleged violations:

(a)    In March, 2009, Kenneth Abbot reported the violations described herein to the Inspector General for the Department of Interior (DOI).

(b)    In May, 2009, counsel for Kenneth Abbott participated in a conference call with the DOI Office of the Solicitor and MMS employees and further detailing the violations at the BP Atlantis Facility.

(c)    In July, 2009, FWW wrote a letter to MMS describing the violations and calling for the immediate shutdown of the BP Atlantis Facility until MMS could assure that the BP Atlantis Facility was safe to operate.

(d)    In September, 2009, FWW wrote a letter to MMS requesting a meeting to discuss BP's ongoing violations.

(e)    In November, 2009, FWW wrote a letter to MMS requesting a meeting to discuss general MMS regulation of platforms.

(f)    In January, 2010, FWW met with MMS to discuss platform regulation, and FWW mentioned the ongoing violations of the BP Atlantis Facility.

(g)    In February, 2010, FWW emailed MMS regarding platform regulation and received a response from MMS specifying which MMS regulations apply to platform components related to process safety equipment.

(h)    In March, 2010, FWW responded to the MMS statement (1) disagreeing with MMS regarding its conclusion that "as-built" documentation is not required for certain platform components and (2) explaining the illogicality of MMS conclusions.

     (i)     In April, 2010, FWW submitted a detailed, substantive legal letter (1) outlining the issues that MMS should investigate as to the BP Atlantis Facility, and (2) requesting MMS investigate itself and determine why minimal action was taken.

     (j)     In May, 2010, counsel for FWW and Mr. Abbott emailed DOI a detailed letter again outlining BP's violations and informing DOI of its intention to sue should the DOI fail to halt productions at the BP Atlantis Facility by May 17, 2010.

4.1     Further, Plaintiffs are not required to provide notice when the alleged violations "constitute[] an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Defendants' failure to enforce DOI and MMS statutes, regulations, practices, and policies constitutes such a threat and warrants immediate action by Defendants. As described herein, the inevitable repercussions of Defendants' omissions imminently threaten the health of the public and the environment, and the legal interests of the Plaintiffs. For example, BP's worst-case scenario indicates that an oil spill from the BP Atlantis Facility could be many times larger than the current oil spill from the BP Deepwater Horizon Facility. As of May 14, 2009, the Horizon spill has resulted in a closure of fisheries encompassing 19,377 square miles, or eighty percent of the Gulf of Mexico Exclusive Economic Zone. The catastrophic Horizon oil spill would be "a mere drop in the bucket" when compared to the potential size of a spill from the BP Atlantis Facility. As evidenced by the recent Deepwater Horizon oil spill, oil is toxic to the plants and animals at the base of the marine food chain. It also sickens and kills birds, mammals, and fish. Oil spills can severely harm coastal economies, including the country's $32 billion commercial fishing industry, which would undoubtedly affect Plaintiff FWW, and the $60 billion ocean and coastal tourism and recreation industries. A similar spill from the BP Atlantis Facility would have a calamitous effect on marine life, endangering the public

health and the economic viability of Plaintiffs. According to BP's own worst-case analysis in its environmental assessment, in two days, a blow-out from the BP Atlantis Facility would spill more oil that the Exxon Valdez.

## V.
## LEGAL BACKGROUND

### A. THE SUBMERGED LAND ACT

5.0     The United States, through DOI, leases the right to explore, develop, and produce the oil and gas contained within the designated lease area. Under, the Submerged Land Act, 43 U.S.C. § 1337, each lease entered into between the United States and an oil and gas operator, such as BP, must contain the following terms and provisions:

> (b) Terms and provisions of oil and gas leases
>
> An oil and gas lease issued pursuant to this section shall—
>
> (1) be for a tract consisting of a compact area not exceeding five thousand seven hundred and sixty acres, as the Secretary may determine, unless the Secretary finds that a larger area is necessary to comprise a reasonable economic production unit;
>
> (2) be for an initial period of—
>> (A) five years; or
>> (B) not to exceed ten years where the Secretary finds that such longer period is necessary to encourage exploration and development in areas because of unusually deep water or other unusually adverse conditions, and as long after such initial period as oil or gas is produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon;
>
> (3) require the payment of amount or value as determined by one of the bidding systems set forth in subsection (a) of this section;
>
> (4) entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the

development and production plan required by this subchapter;

(5) provide for suspension or cancellation of the lease during the initial lease term or thereafter pursuant to section 1334 of this title;

(6) contain such rental and other provisions as the Secretary may prescribe at the time of offering the area for lease; and

(7) provide a requirement that the lessee offer 20 per centum of the crude oil, condensate, and natural gas liquids produced on such lease, at the market value and point of delivery applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

43 U.S.C. § 1337(b).

5.1     Accordingly, all leases for production rights between the United States and companies such as BP must include subsection (b)(5) of 43 U.S.C. § 1337, which provides "for suspension or cancellation of the lease . . . pursuant to section 1334 of this title."

5.2     Under section 1334 of the Submerged Land Act, "suspension or temporary prohibition" is required "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas lease or not leased), or to the marine, coastal or human environment." 43 U.S.C. § 1334(a)(1)(B). Cancellation of the lease is proper "[w]henever the owner of any producting[sic] lease fails to comply with any of the provisions of this Act, of the lease, or of the regulations issued under this Act, such lease may be forfeited and canceled." 43. U.S.C. § 1334(d).

5.3     The Submerged Land Act further prescribes that DOI must "enforce the safety and environmental regulations promulgated pursuant to this Act." 43 U.S.C. § 1348(a).

### B.   MMS AUTHORITY

5.4     Pursuant to 30 C.F.R. § 250.101, "[t]he Secretary of the Interior []
authorize[s] the Minerals Management Service [] to regulate oil, gas, and sulphur
exploration, development, and production operations on the outer Continental Shelf."
*Id.* Such regulations are incorporated into every lease entered into between the United
States and an oil and gas operator, and are enforceable by DOI and MMS. *See* 43 U.S.C.
§ 1334(b); 43 U.S.C. § 1348(a); 30 C.F.R. 250.101(b)(2).

5.5     To protect the environment and public health, MMS regulations require
oil and gas operators to certify and verify in writing the design and construction of its
production platform and related equipment, including all facilities. 30 C.F.R. §
250.900(b); 30 C.F.R. § 250.912(a)(1).

5.6     DOI and MMS are charged with the duty of enforcing these regulations,
and because such regulations are enforced for the purposes of protecting the
environment and public health, a violation of such constitutes a violation of 43 U.S.C. §
1334(a)(1)(B) and requires temporary prohibition of operations, including production.

5.6     DOI and MMS are tasked with not only enforcing its own regulations, but
are also tasked with ensuring that oil and gas operations do not pose "a threat of
serious, irreparable, or immediate harm to damage to life . . ., or to the marine, coastal,
or human environment." 43 U.S.C. § 1334(a)(1)(B).

5.7     Accordingly, Risk Management Plan ("RMP") regulations promulgated
under the authority of the Clean Air Act, 42 U.S.C. 7401, et seq., are applicable to
"prevent[ing] accidental release of regulated substances," and are likewise enforceable
by DOI and MMS. 42 U.S.C. § 7412(r)(7).

5.8     At issue in this matter are DOI and MMS's failure to enforce its
regulations and temporarily prohibit operations, including production, at the BP

Atlantis Facility for continuing violations of the following:

      a.      Violations of the Platform Approval Program, 30 C.F.R. § 250.904(a).

      b.      Violations of the Platform Verification Program, 30 C.F.R. § 250.904(b).

      c.      Violations of the Deepwater Operations Plan, 30 C.F.R. § 250.293.

      d.      Violations of the general promulgated requirements for production systems, 30 C.F.R. § 250.800; 30 C.F.R. § 250.903.

      e.      Violations of the Risk Management Plan, 40 C.F.R. § 68.150.

5.9      The failure of MMS to enforce its regulations has allowed oil and gas operators such as BP to operate facilities without regard to critical safety measures. Such regulations must be enforced to prevent further catastrophic damage to the environment and public health.

5.10      Therefore, pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit operations, including production, pursuant to 43 U.S.C. § 1334(a)(1)(B) at the BP Atlantis Facility because of its ongoing violations to MMS regulations. 43 U.S.C. § 1349(a)(1).

## VI.
## FACTUAL BACKGROUND

### A.    PLAINTIFF MR. ABBOTT OBSERVED AND REPORTED TO DOI AND MMS BP'S FAILURE TO COMPLY WITH ENGINEERING DOCUMENTATION PROTOCOL

6.0      First producing oil in 2007, the BP Atlantis Facility is one of the deepest moored floating dual oil and gas-production facilities in the world. It has a production capacity of 8.4 million gallons of oil and 180 million cubic feet of gas per day.

6.1     In August 2008, Plaintiff Kenneth Abbott, a BP contractor who had been hired in part to supervise the BP's databases that maintain critical project documentations, became aware that BP did not have a large number of "as-built" drawings for the subsea components of the BP Atlantis Project, and specifically, that it did not have accurately coded and complete "as-built" drawings for its producing subsea components, including "as-built" risers and Piping and Instrument Diagrams ("P&IDs").

6.2     Mr. Abbott attests that engineering projects such as Atlantis involve multiple phases of design and construction engineering documents, beginning as design concepts and ending with "as-built" engineering documents.  The phases and phraseology of BP document production include:

(a)     First Phase — "Issued for Approval" engineering documents by the contractor for BP comments;

(b)     Second Phase — "Issued for Design" engineering documents by the contractor after BP comments or concerns are incorporated;

(c)     Third Phase — "Issued for Construction" engineering documents with BP's approval as correct for actual fabrication and construction of the project;

(d)     Fourth Phase — "As-Built" engineering documents that represent the "final" specifications of the component or system.

6.3     Because engineering documents may change drastically from the first "issued for approval" phase to the final "as-built" phase, "as-built" engineering documents are critical to operations as they reflect precisely the design of the component and system, and can be likened to vital "blueprints" for an incredibly complex structure involving millions of moving parts and systems.  Simply put,

without properly maintained "as-built" engineering documents, persons operating the BP Atlantis Facility are flying blind, and have no way to assure the safety of offshore drilling operations, and no way to assure that another calamitous oil spill, like the Deepwater Horizon oil spill, will not reoccur.

6.4    BP management had been aware of the documentation problems in August 2008 and likely earlier. An internal email from management acknowledged that "there are hundreds if not thousands of subsea documents that have not been finalized[,]" and "[t]he P&IDs for Subsea are not complete [and] have ... not been approved or handed over to Operations . . ."

6.5    BP management recognized the gravity of this problem as using the incomplete, unapproved drawings, "*could lead to catastrophic Operator errors* due to their assuming that that drawing is correct.  Turning over incomplete drawings to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard[,] and Process Safety Regulations."

6.6    To track requisite BP documentation, Mr. Abbott and other staff developed a database to track the documents. On November 28, 2008, according to the BP Atlantis Project Drill Center 1 database: (1) only 50 of the project's 7,176 drawings (less than 1%) detailing its subsea components had been "approved for design" by an engineer; (2) only 459 drawings (less than 7%) had been "approved for construction"; (3) only 274 (less than 4%) had been approved as "as built"; and (4) 6,393 (90%) had never been engineer approved.  In sum, federal law requires 100% engineer approved "as-built" drawings for most subsea components and systems.  Yet, MMS and DOI are allowing the BP Atlantis Facility, a facility with a much greater capacity than Deepwater Horizon, to operate with a ninety percent failure rate in terms of complying with federal law.

6.7     After months of contacting management regarding these problems, on February 3, 2009 Mr. Abbott was terminated.  On March 4, 2009, via email, Mr. Abbott reported the documentation issues to the BP's Ombudsman office, and indicated to the Ombudsman that there "ha[d] not been any progress on approving the North Flank as-built drawings," which are the drawings corresponding to another drilling center approved by MMS in 2007.  That same day, the office of the Ombudsman's office acknowledged the email, saying that it would require more time to investigate these concerns.  As reported on May 15, 2010 in the Seattle Times, Stanley Sporkin, a former federal judge whose firm served as BP's ombudsman, stated that Mr. Abbott's allegation "was substantiated, and that's it."

6.8     In March 2009, Mr. Abbott reported the problem to Inspector General for the DOI, and in June, 2009, Mr. Abbott spoke with the DOI Solicitor and MMS staff and recounted his knowledge of BP's documentation deficiencies.

### B.     MMS INACTION

6.9     After the June conversation with Mr. Abbott, the only cognizable action taken by MMS has been to discuss with BP which "as-built" documents MMS would to examine.   MMS then provided BP approximately three weeks to produce these previously discussed "as-built" documents, which were limited only to drawings of the topsides and hull despite Mr. Abbott's assertion of BP's failure to maintain documents for its subsea components.

6.10     MMS has further admitted that it has not investigated whether requisite subsea documentation exists on the BP Atlantis Facility, incorrectly arguing that MMS does not require "as-built" drawings.  Accordingly, no verification has taken place by DOI or MMS to determine whether the critical subsea components and systems of the BP Atlantis Facility have proper documentation.

C. DOCUMENTATION DEFICIENCIES

6.11 An evaluation of BP's databases revealed severe inadequacies in documentation of critical subsea components and systems:

(a) Risers — Subsea risers serve as conduits to transfer materials from the seafloor to production and drilling facilities atop the water's surface, as well as from the facility to the seafloor. There existed zero "issued for design" documents relating to risers, and approximately only ten percent of risers had "as-built" status. Accordingly, the majority of risers are lacking the required proof of engineering integrity necessary for safe operation.

(b) P&IDs — P&IDs accurately detail the piping and instrument systems for the project and are vital to both shutdown and start up. In large part, "as-built" P&IDs and earlier stage approvals for P&IDs did not exist. Of the 2,108 P&IDs, only 303 (14%) had been approved by engineers for design and construction. Only one had been engineer-approved as "as-built." Without completed P&IDs, shutdown and start up operation procedures cannot be verified. Further, without this documentation hazard analyses required to assure safe equipment and procedures cannot be reliably performed.

(c) Safety Shutdown Logic Diagrams — Safety Shutdown Logic Diagrams detail the automatic shut down procedures of critical operations, and are equally vital to safe operation. Complex, computerized logic systems receive data inputs reflecting temperature, pressures, flow rates, valve settings and dozens of other parameters from hundreds of inputs throughout the project and, in emergencies, are to issue instantaneous electronic directives which can then shut down systems, including wellheads located more than a mile below the surface of the sea. Many Safety Shutdown Logic Diagrams were not "as-built",

12

and are instead inadequately listed as "needing up-date."

(d)     Welding Procedure Specifications and Procedure Qualification Records — Welding Procedure Specifications are detailed instructions for performing specific welding operations. Procedure Qualification Records are the formal documents recording the welding conditions and the results of the tests showing that the welding joints meet certain minimum safety and stability requirements.  Thousands of welds, many of which contain oil and gas under high pressures far beneath the surface of the sea, will likely endure significant stress during the upcoming hurricane season. Less than three percent (3%) of Atlantis's subsea Welding Procedure Specifications and Procedure Qualification Records were listed as "approved for design" or "approved for construction." Ninety-five percent (95%) of the records had no final approval at all, calling into question the quality of thousands of critical welds on subsea components.

(e)     Wellheads — Subsea wellheads are the assembly of fittings, valves, and controls connected to the flow lines, tubing, and casing of the well so at to control the flow in the reservoir.  One hundred percent (100%) of wellhead documents had failed to receive BP engineering approval, and therefore it is likely that not one wellhead record existed that accurately identifies the exact specifications of the connectivity of the fittings, valves and controls.

(f)     Subsea Trees — Subsea Trees are positioned on seabed, located on the subsea wellhead and provide, via control systems, well control between well itself and seabed pipeline facilities.  Similar to wellhead records, ninety-eight percent (98%) of subsea tree records lacked any sort of identification.

(g)     Manifolds — Subsea manifolds direct flow from multiple individual wells into multiple production flowlines.  Of the manifold records,

only six percent (6%) had any sort of approved documentation, and none had "as-built" documentation.

(h)     Pipelines/Flowlines — Pipelines/flowlines consist of piping used to convey fluids from the manifold to the platforms. Of the 2,383 documents relating to pipelines/flowlines, zero had "as-built" documentation and only 108 (less than 5%) had issued for construction documentation.

(i)     Umbilical — The umbilical provides the link from the facility through which control is exercised, power is transmitted and utilities are supplied to the subsea wells. The umbilical is a long, flexible construction and consists of tubes, cables, armoring, fillers and wrapping contained within a protective sheath. Because of the multiple functions it performs, extreme reliability is required. With respect to the 454 umbilical documents, only 56 (12%) had "as-built" documentation and forty-three percent (43%) lack any engineering documentation.

(j)     Control Systems — Control systems are designed to operate and monitor subsea trees, manifolds, pipeline terminations and subsea process equipment. Ninety-four percent (94%) of control system documentation was lacking any engineering approval, and less than two percent (2%) retained the requisite "as-built" documentation.

6.12     The following chart provides a summary of the types design documents in existence and the general lack of engineer approved documents for the Drill Center 1 portion of the BP Atlantis Project, for all stages of approval (continued on next page):

| Sector No. | Total | Issued For Design | Issued For Constr. | As-Built | Not Approved | %Not Approved |
|---|---|---|---|---|---|---|
| 30 Subsea Systems (wellheads, manifolds, flowlines and risers) | 1,266 | 27 | 86 | 101 | 1,052 | 83% |
| 31 Wellheads | 22 | 0 | 0 | 0 | 22 | 100% |
| 32 Trees | 570 | 1 | 9 | 1 | 559 | 98% |
| 33 Manifolds | 161 | 5 | 4 | 0 | 152 | 94% |
| 34 Pipelines/Flowlines | 2,383 | 1 | 108 | 0 | 2,274 | 95% |
| 35 Controls | 1,351 | 14 | 36 | 36 | 1,265 | 94% |
| 36 Umbilical | 454 | 2 | 201 | 56 | 195 | 43% |
| 37 Risers | 750 | 0 | 1 | 80 | 669 | 89% |
| 38 Installation | 219 | 0 | 14 | 0 | 205 | 94% |
| TOTALS | 7,176 | 50 | 459 | 274 | 6,393 | 89% |

## D.    BP's HISTORY OF POOR SAFETY & CRIMINAL VIOLATIONS

6.13    BP's history of ongoing violations to safety requirements and criminal statutes foreshadows an inevitable catastrophe of the BP Atlantis Facility.  In addition to the present ongoing catastrophe resulting from the Deepwater Horizon oil spill, which is likely related to BP's failure to abide by industry standard safety practices, BP's record includes (but is not limited to) these violations:

(a)    In 2009, BP entered a consent decree for almost $175 million resulting from its violations of an earlier Clean Air Act consent decree in 1991.

(b)    In 2007, BP agreed to pay over $300 million in fines and penalties from its manipulation of the propane market.

15

(c)     In 2007, BP was fined for leaking underground storage tanks in Michigan.

(d)     In 2006, BP's criminal negligence in Alaska resulted in the largest oil spill ever on the North Slope from BP's corroded, unmaintained pipelines across the frozen tundra, leading to a $20 million criminal fine.

(e)     In 2005, BP's environmental crimes resulted in 15 deaths and hundreds of injuries in the Texas City Refinery, for which BP had paid a $50 million fine as part of a federal felony plea. Both before and after this massive explosion, safety-related violations have averaged one death per year (in addition to the 15 in March, 2005) in this refinery for nearly 10 years.

(f)     In 2005, BP was fined $1.4 million for safety violations.

(g)     In 2002 and 2003, BP was fined for safety violations and violations of leak detection standards.

(h)     In 2000, BP paid $15 million for dumping hazardous materials onto the Alaska North Slope.

(i)     In 2000, BP paid a fine for unlawfully polluting the Allan River in Scotland.

(j)     In 2000, BP paid $32 million under the False Claims Act for underpayment of royalties on federal and Indian leases.

6.14    The gravity of BP's conduct has and will continue to have long lasting effect on the environment and public health, and DOI and MMS's failure to enforce its regulations against BP has only accelerated the time to another BP catastrophe. Accordingly, it is necessary that DOI and MMS be enjoined to temporarily prohibit production at the BP Atlantis Facility in order to protect and prevent further catastrophic destruction, and to further ensure that its regulations are enforced.

16

## VII.
## FIRST CLAIM FOR RELIEF
## VIOLATIONS TO PLATFORM APPROVAL PROGRAM

7.0     Plaintiffs incorporate by reference all preceding paragraphs.

7.1     Pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit productions pursuant to 43 U.S.C. § 1334(a)(1)(B) until it is confirmed by MMS that the BP Atlantis Facility is in compliance with the Platform Approval Program.  43 U.S.C. § 1349(a)(1).

7.2     MMS regulations require that the construction of platforms comply with the Platform Approval Program.  30 C.F.R. § 250.904(a).  In order to obtain "approval" under the program, BP must submit a "[c]omplete set of structural drawings" with "approved for construction" status.  30 C.F.R. § 250.905(d).  Examples of the types of components and systems that require a "[c]omplete set of structural drawings" include "cathodic protection systems; jacket design; pile foundations; drilling, production, and pipeline risers and rise tensioning systems; turrets and turret-and-hull interfaces; mooring and tethering systems; foundations and anchoring systems." *Id*.

7.3     Per BP's document database, BP failed to retain a "[c]omplete set of structural drawings" with regard to at least one of its cited examples: risers.  Out of 750 drawings of risers, BP has 699 (93.2%) drawings with no approval and only one with "approved for construction" documentation.  Accordingly, the lack of sufficient riser documentation violates the Platform Approval Program.  As noted above, risers are critical to proper operations of the BP Atlantis Facility. Further, subsea choke and kill systems are typically arranged on the outside of particular risers, and as evidenced by the Deepwater Horizon disaster, are vital to emergency response.

7.4     With regard to other components and systems of the Atlantis Facility, there existed a lack of requisite "approved for construction" documentation for subsea

systems, wellheads, trees, manifolds, pipelines/flowlines, controls, umbilical, installation. *See supra*, ¶ 6.12. Out of a 7,176 documents, only 459 (less than 7%) had "approved for construction" documentation and thus are violating the requirements of the Program.

7.5     The Platform Approval Program also requires the submission of a statement certifying that "[t]he design of this structure has been certified by a recognized classification society, or a registered civil or structural engineer or equivalent, or a naval architect or marine engineer or equivalent, specializing in the design of offshore structures. *The certified design and as-built plans and specifications will be on file at (give location).*" 30 C.F.R. § 250.905(j) (emphasis added). Because BP only had 80 "as-built" riser drawings out of 750 total riser drawings (less than 11%), BP could not have had all the "as-built plans and specifications . . . on file[,]"' as required by this provision, and has thus failed to "compile, retain, and make available to MMS representatives for the functional life of all platforms: . . . the as-built drawings" as required under 30 C.F.R. §§ 250.903(a)(1).

## VIII.
## SECOND CLAIM FOR RELIEF
## VIOLATION OF PLATFORM VERIFICATION PROGRAM

8.0     Plaintiffs incorporate by reference all preceding paragraphs.

8.1     Pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit productions pursuant to 43 U.S.C. § 1334(a)(1)(B) until it is confirmed by MMS that the BP Atlantis Facility is in compliance with the Platform Verification Program. 43 U.S.C. § 1349(a)(1).

8.2     MMS regulations require that the construction of deepwater (> 400 ft.) platforms comply with the Platform Verification Program. 30 C.F.R. § 250.904(b). In order to obtain "verification" under the program, BP must include in its verification

plan with "[a]ll design documentation specified in § 250.905." 30 C.F.R. § 250.912(a)(1). The "documentation specified in § 250.904" is the exact documentation required under the Platform Approval Program. *See supra*, ¶ 7.1 - 7.5. Accordingly, because BP has not retained the necessary documents required under the Platform Approval Program, BP has consequently no "complete set of structural drawings" with "approved for construction" status. 30 C.F.R. § 250.905.

8.3     The Platform Verification Program also requires approval of a fabrication verification plan, which must include "welding procedures" and "methods and extent of nondestructive examinations for welds and materials." 30 C.F.R. §§ 250.912(b)(3)(ii) & (vi). However, less than three percent (3%) of Atlantis's subsea Welding Procedure Specifications and Procedure Qualification Records had an "issued for construction" or "issued for design." Ninety-five percent (95%) of the records have no final approval at all, calling into question the quality of thousands of critical welds on subsea components.

## IX.
### THIRD CLAIM FOR RELIEF
### VIOLATION OF DEEP WATER OPERATIONS PLAN

9.0     Plaintiffs incorporate by reference all preceding paragraphs.

9.1     Pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit productions pursuant to 43 U.S.C. § 1334(a)(1)(B) until it is confirmed by MMS that the BP Atlantis Facility is in compliance with the Deepwater Operations Plan. 43 U.S.C. § 1349(a)(1).

9.2     MMS regulations require that all deepwater oil and gas operators obtain approval of a Deepwater Operations Plan, 30 C.F.R. § 250.293. Such a plan requires completion of a safety hazard analysis pursuant to 30 C.F.R. § 250.292(j), and must comply with the American Petroleum Institute Recommended Practice for Design and

Hazards Analysis for Offshore Production Facilities API RP 14J.

9.3     To comply with API RP 14J:

(a)     A facility must maintain P&IDs and certain other drawings, as the "(t)he minimum safety and environmental information, which forms the basis of any hazards analysis."

(b)     Any Hazards and Operability Studies require a "complete set of . . . P&IDs" and other documents.

(c)     P&IDs and certain other drawings needed for a hazards analysis of even the lowest risk facilities must be "up-to-date."

(d)     P&IDs and certain other documents need to be "maintained throughout the life of a facility."

9.4     BP failed to maintain P&IDs. Of the 2,108 P&IDs detailing the subsea components of the BP Atlantis Facility, only 303 (14%) has been approved by engineers for design and construction. Accordingly, because BP has not maintained a complete, accurate, and up-to-date, or "as-built," set of P&IDs throughout the life of the BP Atlantis Facility, BP is not in compliance with API RP 14J, and consequently, 30 C.F.R. § 250.292(j).

## X.
### FOURTH CLAIM FOR RELIEF
### GENERAL PROMULGATED REQUIREMENTS
### OF PRODUCTION SYSTEMS

10.0     Plaintiffs incorporate by reference all preceding paragraphs.

10.1     Pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit productions pursuant to 43 U.S.C. § 1334(a)(1)(B) until it is confirmed by MMS that the BP Atlantis

Facility is in compliance with the general promulgated requirements of production systems.  43 U.S.C. § 1349(a)(1).

10.2    MMS requires that all oil and gas operators abide by the general regulations promulgated under 30 C.F.R. § 250.800 which require that all floating productions systems "[c]omply with API RP 14J."  Compliance with the API RP 14J is also required for a Deepwater Operations Plan.  *See supra,* ¶ 9.2 – 9.4.  Accordingly, because BP has not retained the necessary documents required under the Deepwater Operations Plan, BP has consequently failed to meet the requirements of API RP 14J.  30 C.F.R. § 250.800.

10.3    MMS also requires that all oil and gas operators abide by the requirements set forth under 30 C.F.R. § 250.905 which require operators to "compile, retain, and make available to MMS representatives for the functional life of all platforms."  30 C.F.R. § 250.905(a).  BP has failed to maintain the requisite "as-built" documents for its subsea components and systems.  Of the 7,176 documents, only 274 (less than 4%) documents had retained "as-built" status, leaving the majority of documents in violation of MMS general requirements.

10.4    MMS also requires that all operators "must . . . use, [and] maintain . . . all platforms and related structures on the Outer Continental Shelf . . . so as to ensure their structural integrity for the safe conduct of drilling, workover, and production operations."  30 C.F.R. § 250.900(a).  To ensure structural integrity, it is necessary that operators retain "as-built" documentation, and BP 's failure to maintain such documentation foregoes the possibility that the BP Atlantis Facility is structurally sound.

## XI.
## FIFTH CLAIM FOR RELIEF
## VIOLATION OF RISK MANAGEMENT PLAN

11.0    Plaintiffs incorporate by reference all preceding paragraphs.

11.1    Pursuant to 43 U.S.C. § 1349 of the Submerged Land Act, Plaintiffs seek to compel DOI and MMS to comply with this Act and temporarily prohibit productions pursuant to 43 U.S.C. § 1334(a)(1)(B) until it is confirmed by MMS that the BP Atlantis Facility is in compliance with the Risk Management Plan.  43 U.S.C. § 1349(a)(1).

11.2    To prevent chemical and petro-chemical releases, Risk Management Plan regulations require, among other things, operators must submit a risk management plan certifying management has documentation that equipment conforms to appropriate engineering design codes. 40 C.F.R. § 68.65.   Compliance requires documentation of P&IDs. 40 C.F.R. § 68.65(d).

11.3    BP failed to maintain P&IDs.  Of the 2,108 P&IDs detailing the subsea components of the BP Atlantis Facility, only 303 (14%) had been approved by engineers for design and construction. Accordingly, because BP had not maintained a complete, accurate, and up-to-date, or "as-built," set of P&IDs throughout the life of the BP Atlantis Facility, BP is not in compliance with 40 C.F.R. § 68.65(d).

## XII.
## CONCLUSION

12.0    BP's failure to abide by the Platform Approval Program, the Platform Verification Program, the Deepwater Operations Plan, the Risk Management Plan, and other general promulgated requirements poses an imminent risk to the environment and public health.  The failure of DOI and MMS to enforce regulations that serve to promote safety and the protection of human life and the environment renders a sham the congressional declaration of policy of the Submerged Lands Act:

> It is hereby declared to be the policy of the United States that
> — . . . (6) operations in the outer Continental Shelf should be
> conducted in a safe manner by well-trained personnel using
> technology, precautions, and techniques sufficient to prevent
> or minimize the likelihood of blowouts, loss of well control,
> fires, spillages, physical obstruction to other users of the
> waters or subsoil and seabed, or other occurrences which
> may cause damage to the environment or property.

12.1    To fulfill the policy of the United States, DOI and MMS must either
enforce applicable regulations or be compelled to do so. Here, DOI and MMS have
failed to enforce those regulations, and unless relief is granted by this Court, a
catastrophe is certain to occur at the BP Atlantis Facility, which will undoubtedly cause
unprecedented, irreparable damages to the environment in and surrounding the Gulf of
Mexico and the general public health.

## XIII.
## PRAYER FOR RELIEF

13.0    WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a)    Pursuant to 43 U.S.C § 1349(a)(1), an injunction requiring
Defendants to enforce the provisions of the Submerged Lands Act, and to
temporarily prohibit operations at the BP Atlantis Facility until compliance with
MMS regulations at such facility is verified.

(b)    Pursuant to 28 U.S.C. § 1651 and in the alternative to the relief
requested in subparagraph (a), a writ of mandamus compelling Defendants to
carry out their nondiscretionary duty to enforce the provisions of the Submerged
Land Act, and to temporarily prohibit operations at the BP Atlantis Facility until
compliance with MMS regulations at such facility is verified.

(c)    Pursuant to 28 U.S.C. § 2412 or other authority, award Plaintiffs
costs, expenses, and attorney fees associated with litigation.

(d)    Such other and further relief as the Court may deem proper.

Respectfully submitted:

/s/ Mikal C. Watts

_____

Mikal C. Watts
State Bar No. 20981820
Federal Bar No. 12419
MCWatts@wgclawfirm.com
WATTS GUERRA & CRAFT, L.L.P.
Four Dominion Drive,
Bldg. Three, Suite 100
San Antonio, Texas 78257
Telephone: (210) 447-0500
Fax (210) 447-0501

**ATTORNEY IN CHARGE**

J. Hunter Craft
State Bar No. 24012466
Federal Bar No. 24377
HCraft@wgclawfirm.com

Emily C. Jeffcott
State Bar No. 24069993
Federal Bar No. 1069933
ECJeffcott@wgclawfirm.com

**ATTORNEYS FOR PLAINTIFF**

OF COUNSEL:

David L. Perry
State Bar No. 15800000
Federal Bar No. 5685
DLPerry@perryhaas.com

René Haas
State Bar No. 21406800
Federal Bar No. 5680
RHaas@perryhaas.com

Perry & Haas
P.O. Box 1500
Corpus Christi, TX. 78403
Telephone: (361) 880-7500
Fax: (361) 887-9507